In re The **CALDOR CORPORATION,**
Caldor, Inc.—CT, Caldor, Inc.—
N.Y., Debtors.

**Term Loan Holder Committee,**
**Appellant,**

v.

**Ozer Group, L.L.C., Gordon Brothers Retail Partners, L.L.C., Wind–Down Oversight Committee, Caldor, Inc.— N.Y., The Caldor Corporation, Caldor, Inc.—CT & SBCG Co., LLC, Appellees.**

**Docket No. 00–5044.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 23, 2001.

Decided: Sept. 9, 2002.

Martin J. Bienenstock (Michele J. Meises, Weil, Gotshal & Manges LLP, New York, NY), for Appellant.

Stephen J. Shimshak (Allan J. Arffa, Curtis J. Weidler, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY), for Appellee.

Before: WALKER, Chief Judge, F.I. PARKER and KATZMANN Circuit Judges.

F.I. PARKER, Circuit Judge.

Term Loan Holder Committee ("TLHC") moved to intervene pursuant to 11 U.S.C. § 1109 and Federal Rule of Civil Procedure 24 in an adversary proceeding initiated by The Ozer Group, LLC, Gordon Brothers Retail Partners, LLC, and SBCG Co., LLC (collectively, the "Joint Liquidators") against debtors, The Caldor Corporation, Caldor, Inc.—CT, Caldor, Inc.—N.Y., *et al.* (collectively, "Caldor"). The United States Bankruptcy Court for the Southern District of New York (James L. Garrity, Jr., *Bankr.Judge*) denied TLHC's motion by order dated September 30, 1999, and the United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*), affirmed the denial by order dated May 8, 2000.

On this appeal, TLHC contends that in reaching their decisions, the bankruptcy and district courts erroneously interpreted § 1109(b) of the Bankruptcy Code, which states that a party in interest "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). TLHC argues that this provision creates an unconditional statutory

right for parties in interest to intervene in adversary proceedings that occur in connection with a Chapter 11 bankruptcy case. Because we find that the plain text of the statute indicates Congress intended to grant such a right, we reverse the lower courts' decisions and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

Caldor constituted one of the largest discount retailers in the Northeast–Mid–Atlantic Corridor, operating 145 stores in ten East Coast states. On September 18, 1995, Caldor filed for protection under Chapter 11 of the Bankruptcy Code. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, Caldor remained in possession and control of its businesses as a debtor in possession.

TLHC represents the holders of a term loan under a credit agreement dated October 21, 1993 ("Term Loan Holders") and the holders of a real estate loan under a credit agreement dated August 8, 1995 ("Real Estate Loan Holders"). At the time of Caldor's bankruptcy petition, the term loan, worth approximately $215 million, secured by a first lien against Caldor's inventory and proceeds, and the real estate loan, worth $37.1 million, was secured by real estate owned by Caldor. As part of Caldor's post-petition financing plan, the Term Loan Holders were granted a second lien against most of Caldor's real estate interests, and the Real Estate Loan Holders were granted a third lien against such interests. The Term Loan Holders and Real Estate Loan Holders both looked toward the proceeds from the sale of Caldor's inventory and leases to satisfy their secured claims.

After unsuccessfully attempting to reorganize, Caldor decided in early 1999 to wind down its operations and liquidate its assets. By a January 22, 1999 order, the bankruptcy court approved Caldor's wind-down decision.

Pursuant to a settlement agreement among the Term Loan Holders, the Real Estate Loan Holders, and Caldor, approved by the bankruptcy court on February 8, 1999, the Term Loan Holders and the Real Estate Loan Holders were paid certain proceeds of their collateral and were granted, and still hold, allowed administrative claims aggregating $20 million.

As part of its wind-down, Caldor decided to sell substantially all of its inventory in the remaining stores (the "Merchandise"). Caldor solicited bids for the right to purchase the inventory and chose to sell its Merchandise to the Joint Liquidators, who had formed a joint venture. The Joint Liquidators and Caldor negotiated a Purchase and License Agreement (the "Purchase Agreement"), executed on or about February 1, 1999. By application dated February 2, 1999, (the "Application"), Caldor sought an order from the bankruptcy court approving the Purchase Agreement. TLHC filed a limited objection to the break-up fee requested in the Application and participated at the hearing to approve the Application on February 11, 1999. After the hearing and competitive bidding in open court, the bankruptcy court approved an amended version of the Purchase Agreement by an order dated February 11, 1999 (the "Approval Order").

Pursuant to the Purchase Agreement and the Approval Order, the Joint Liquidators transferred over $223 million to Caldor and conducted going-out-of-business sales at Caldor's stores, selling all of Caldor's remaining inventory to the public. The going-out-of-business sales commenced on February 12, 1999 and were completed in mid-March.

Thereafter, Caldor allegedly refused to honor certain purchase price adjustment provisions of the Purchase Agreement. Based on this refusal, the Joint Liquidators initiated this Adversary Proceeding against Caldor on July 19, 1999, alleging breach of contract and related claims, and seeking over $26 million in damages. Caldor answered the Joint Liquidators' complaint by stating various affirmative defenses and counterclaims for, among other things, reformation of the contract based on mutual mistake and fraud in the inducement.

On August 19, 1999, TLHC moved to intervene in the Adversary Proceeding under 11 U.S.C. § 1109(b) and Federal Rule of Civil Procedure ("FRCP") 24.[1] TLHC sought intervention as a matter of right under FRCP 24(a), arguing that § 1109(b) conferred on it a right to appear and be heard. TLHC asserted furthermore that its constituents' administrative claim for $20 million constituted the largest single administrative claim in Caldor's Chapter 11 case, and since Caldor's estates were administratively insolvent, the outcome of the Joint Liquidators' Adversary Proceeding seeking $26 million from Caldor would "necessarily impact upon the amount of property of the estates available for the benefit of creditors." TLHC Mot. to Intervene, Aug. 19, 1999 ¶¶ 14–15. In light of its pecuniary interest in the outcome of the Adversary Proceeding, TLHC argued that it was the "true party in interest in Caldor's [C]hapter 11 case." *Id.* ¶ 15. TLHC also sought permissive intervention under FRCP 24(b).

The Joint Liquidators opposed TLHC's motion, denying there were any grounds for TLHC to intervene as of right or permissively. In particular the Joint Liquidators argued that § 1109(b) provided a party in interest with a right to be heard in a case only and that it stated nothing about intervention in an adversary proceeding.

Caldor, for its part, urged the bankruptcy court to grant TLHC's motion, acknowledging that it had "solicited and encouraged the active participation of [TLHC] in this adversary proceeding." Caldor Corp. Resp. to TLHC Mot. to Intervene, Sept. 21, 1999, ¶ 7.

On September 30, 1999, the bankruptcy court denied TLHC's motion and read its opinion into the record. Noting that the Joint Liquidators did not dispute that TLHC was a party in interest under § 1109(b), the bankruptcy court acknowledged the split in authority over whether § 1109(b) applies to a Chapter 11 case only or to adversary proceedings commenced in such a case as well. The bankruptcy court cited *Official Unsecured Creditors' Com-*

---

**1.** Pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7001, intervention in adversary proceedings is governed by FRBP 7024, which adopts FRCP 24. FRCP 24 provides in relevant part:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. Fed.R.Civ.P. 24.

*mittee v. Michaels (In re Marin Motor Oil, Inc.),* 689 F.2d 445 (3d Cir.1982) *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983) and *Sarah R. Neuman Foundation, Inc. v. Garrity (In re Neuman),* 124 B.R. 155 (S.D.N.Y.1991) for the proposition that § 1109(b) grants a right to intervene in adversary proceedings, and *Fuel Oil Supply and Terminaling v. Gulf Oil Corp.,* 762 F.2d 1283 (5th Cir.1985) and *995 Fifth Avenue Associates, L.P. v. New York State Department of Taxation and Finance (In re 995 Fifth Avenue Associates, L.P.),* 157 B.R. 942 (S.D.N.Y.1993) for the opposing view that § 1109(b) is applicable only to the Chapter 11 case. The bankruptcy court concluded that the latter cases "state the better view" and held that § 1109(b) therefore provided no basis for TLHC to intervene under FRCP 24(a)(1).

With regard to FRCP 24(a)(2), the bankruptcy court reasoned that Caldor, as a debtor-in-possession, was a fiduciary of its creditors and that in liquidating its assets, Caldor was obligated to act in the best interests of its creditors. The court found that TLHC failed to allege or adduce any evidence that Caldor would not adequately represent TLHC's interests in the Adversary Proceeding and rejected TLHC's bid to intervene under FRCP 24(a)(2). The bankruptcy court also denied TLHC permission to intervene under FRCP 24(b), concluding that TLHC's interest in maximizing its recovery in Caldor's administratively insolvent case was not a claim or defense within the meaning of FRCP 24(b)(2).

TLHC appealed, and the district court affirmed the bankruptcy court's decision in *Term Loan Holder Comm. v. Ozer Group, LLC (In re Caldor, Inc.—N.Y.),* No. 95 B 44080(JLG), 2000 WL 546465 (S.D.N.Y. May 3, 2000). The district court reviewed the cases identified by the bankruptcy court on the application of § 1109(b) to

adversary proceedings and agreed with the bankruptcy court that *"Fuel Oil* and *995 Fifth Avenue* provide[d] slightly more persuasive reasoning" than *Marin* and *Neuman. Id.* at *4. The district court explained:

> As those decisions point out, "legislative and judicial signposts demonstrate that 'Congress did not create an absolute statutory right to intervene in bankruptcy adversary proceedings through § 1109(b)' but instead 'intended courts to apply Rule 24(a)(2) . . . to applications to intervene in bankruptcy proceedings under § 1109(b).' "

*Id.* (quoting *995 Fifth Avenue,* 157 B.R. at 948 (quoting *Fuel Oil,* 762 F.2d at 1287)).

In further support of its decision not to follow *Marin,* the district court pointed out that *Marin*'s reasoning followed the then-current version of *Collier on Bankruptcy. Id.* The court observed that since *Marin* was decided, the treatise had changed its position several times through its various revisions, from favoring a view that § 1109(b) covered adversary proceedings to opposing such an view and then back again to favoring it. "Collier's flip-flop over the past twenty years undermines its authoritativeness, though it is also an indication of the closeness of the question." *Id.*

The district court also noted that in light of *Fuel Oil* and other opinions critical of *Marin,* the Third Circuit itself had subsequently questioned "whether or not [*Marin*] is the better view." *Id.* (quoting *Phar–Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1233 (3d Cir.1994)). The court stated that in *Phar–Mor,* the Third Circuit suggested it might have rejected *Marin*'s position were it not for the circuit's internal operating procedures requiring the court to sit *en banc* to depart from a prior panel's decision. *Id.*

Finally, the district court explained that *Marin*'s holding was founded in part on the *Marin* Court's conclusion that " 'Congress intended a creditors' committee to have more extensive rights in a reorganization than in a liquidation.' " *Id.* at *5 (quoting *Marin,* 689 F.2d at 450, 455–56). In the present Chapter 11 case, the district court reasoned, Caldor has abandoned its reorganization efforts and moved into liquidation. *Id.* "All other considerations aside, the fact that Caldor is in liquidation tips the balance against a statutory right to intervene." *Id.*

After concluding that § 1109(b) provided TLHC no avenue to intervene under FRCP 24(a)(1), the district court also affirmed the bankruptcy court's decision not to grant TLHC leave to intervene under FRCP 24(a)(2) or (b). *Id.* at *5–*6

TLHC now appeals from the district court's holding solely on the issue of whether § 1109(b) confers on a party in interest an unconditional right to intervene in an adversary proceeding within the meaning of FRCP 24(a)(1). This Court has jurisdiction pursuant to 28 U.S.C. § 158(d).

## II. DISCUSSION

■ In this appeal from a district court's affirmation of a bankruptcy court ruling, our review of the bankruptcy court's decision is "independent and plenary," *Bell v. Bell (In re Bell),* 225 F.3d 203, 209 (2d Cir.2000), and we review the bankruptcy court's interpretation of the bankruptcy statute *de novo, Capital Communications Fed. Credit Union v. Boodrow (In re Boodrow),* 126 F.3d 43, 47 (2d Cir.1997).

### A. *Prior case law*

■ Whether § 1109(b) confers on parties in interest an unconditional right to intervene in adversary proceedings is a question of first impression in this Circuit.[2] To date, the Third and Fifth Circuits are the only Courts of Appeals to have ruled on the issue.

In *Official Unsecured Creditors' Committee v. Michaels (In re Marin Motor Oil, Inc.),* 689 F.2d 445 (3d Cir.1982), the Third Circuit answered the instant question in the affirmative. Looking first to the text of § 1109(b), the *Marin* Court found that the "language of the statute would seem clearly to favor the position espoused by the [Creditors'] Committee" that the provision accorded it an absolute right to intervene in an adversary proceeding instituted in connection with the Chapter 11 case. *Id.* at 449.

The *Marin* Court buttressed its interpretation of the statutory language with a detailed account of the statutory and legislative history of § 1109(b), showing that § 1109(b) was derived from § 206 of Chapter X of the predecessor bankruptcy law. *Id.* at 451. The Court explained that former § 206 had granted creditors "the right to be heard on all matters arising in a proceeding under this chapter" and had been construed by courts and commentators to provide an absolute right to appear and be heard in adversary proceedings. *Id.* at 451–52 (internal quotation marks omitted). Finally, the *Marin* Court reviewed the existing bankruptcy court case law on § 1109(b) and determined that it generally supported the view that § 1109(b) "should be given as broad and absolute a reading as [§ ] 206 had received." *Id.* at 453.

**2.** In *Unsecured Creditors Comm. v. Noyes (In re STN Enters.),* 779 F.2d 901, 904 (2d Cir. 1985), we held that 11 U.S.C. §§ 1103(c)(5) and 1109(b) implied a qualified right for cred-

itors' committees to initiate adversary proceedings where the trustee or debtor in possession unjustifiably failed to bring suit.

In *Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283 (5th Cir. 1985), the Fifth Circuit rejected *Marin* and held that § 1109(b) was not addressed to adversary proceedings. The *Fuel Oil* Court explained:

At first blush, prior bankruptcy practice and the legislative history of § 1109(b) appear to support the view of the Third Circuit that § 1109(b) requires a bankruptcy court automatically to allow a party in interest to intervene in adversary proceedings.... Furthermore, as the *Marin* court pointed out, the Bankruptcy Code makes no distinction between "case" and "adversary proceeding" for intervention purposes. Based on the Bankruptcy Code alone, therefore, the argument that § 1109(b) creates an absolute right to intervene in adversary proceedings appears strong.

*Id.* at 1285–86.

The Fifth Circuit concluded, however, that the *Marin* Court's reasoning based on the text of the statute, legislative history, and prior bankruptcy practice "loses much of its force ... when § 1109(b) is juxtaposed with the procedural rules governing intervention." *Id.* at 1286. The *Fuel Oil* Court observed that courts are hesitant to find unconditional statutory rights of intervention and tend to construe FRCP 24(a)(1) narrowly. In light of the fact that "[t]he statutes that do confer an absolute right to intervene generally confer that right upon the United States or a federal regulatory commission," the Court found that "[§ ] 1109(b) is not the type of statute generally considered to provide an absolute right to intervene." *Id.*

The *Fuel Oil* Court further noted that Congress had drawn "distinctions between bankruptcy 'cases' and the proceedings related to them" in several provisions in Title 28 of the United States Code and in the bankruptcy rules. *Id.* In particular,

the Court pointed out that the advisory committee note to FRBP 7024 provided that "[i]ntervention in a case and intervention in an adversary proceeding must be sought separately." Fed. R. Bankr.P. 7024 advisory comm. note. According to the Court, this note "makes no sense if intervention in the 'case' provided entrance to the adversary proceeding as well." *Id.*

Finally, the *Fuel Oil* Court reasoned on policy grounds that Congress must have intended courts to apply FRCP 24(a)(2) rather than FRCP 24(a)(1) to applications to intervene in adversary proceeding. *Id.* at 1287. By applying FRCP 24(a)(2), "the bankruptcy court is permitted to control the proceeding by restricting intervention to those persons whose interests in the outcome of the proceeding are not already adequately represented by existing parties." *Id.*

Although no other circuit courts have directly addressed this issue, the First, Fourth, and Tenth Circuits have indicated in dicta that they favor the Fifth Circuit's view. *See Richman v. First Woman's Bank (In re Richman)*, 104 F.3d 654, 658 (4th Cir.1997) (adopting *Fuel Oil*'s policy arguments concerning intervention in the context of a Chapter 7 proceeding); *Vermejo Park Corp. v. Kaiser Coal Corp. (In re Kaiser Steel Corp.)*, 998 F.2d 783, 790 (10th Cir.1993); *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1142 n. 8 (1st Cir.1992) (citing *Fuel Oil* for the proposition that § 1109(b) does not afford a right to intervene under FRCP 24(a)(1)).

B. *Analysis*

 The task of resolving a dispute over the meaning of a provision of the Bankruptcy Code "begins where all such inquires must begin: with the language of the statute itself." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "[A]s long

as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *Id.* at 240–41, 109 S.Ct. 1026. "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). We thus begin by inquiring whether the plain language of the statute, when given "its ordinary, common meaning," *Tyler v. Douglas,* 280 F.3d 116, 122 (2d Cir.2001), is ambiguous.

### 1.

The text of § 1109(b) states in relevant part that "[a] party in interest … may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). The crucial issue before us is whether we should read the term "case" in § 1109(b) to exclude adversary proceedings. *In re Marin,* 689 F.2d at 450. We therefore first consider the meanings of "case," "proceeding," and "issue."

"Case," as used in the Bankruptcy Code, refers to litigation "commenced by the filing with the bankruptcy court of a petition" under the appropriate chapter of Title 11. *See* 11 U.S.C. §§ 301, 302, 303(b), 304(a). The bankruptcy "case" remains open until "an estate is fully administered and the court has discharged the trustee." 11 U.S.C. § 350. As one court has explained, "[t]he 'case' is the basis for taking control of all pertinent interests in property, dealing with that property, determining entitlements to distributions, [establishing] the procedures for administering the mechanism, and discharging the debtor."

*Menk v. LaPaglia (In re Menk),* 241 B.R. 896, 908 (B.A.P. 9th Cir.1999).

While "case" is a term of art in the bankruptcy context, it is a term that is well-understood. Indeed, the Joint Liquidators have pointed to no authority that disagrees with the commonplace notion that the "case" triggered by a bankruptcy petition is an "umbrella litigation often covering numerous actions that are related only by the debtor's status as a litigant." *Sonnax Indus. v. Tri Component Prods. Corp. (In re Sonnax Indus.),* 907 F.2d 1280, 1283 (2d Cir.1990); *see, e.g., Bank United v. Manley,* 273 B.R. 229, 235 (N.D.Ala.2001) ("A title 11 case is the umbrella under which all of the proceedings that follow the filing of a bankruptcy petition take place." (internal quotation marks and citation omitted)); 7 *Collier on Bankruptcy* ¶ 1109.04[1][a][i] (15th ed. rev.2001) ("A bankruptcy case is … in colloquial terms, 'the whole ball of wax.' ").

The term "proceeding," too, has a generally accepted meaning in the bankruptcy context. *Black's* indicates that a bankruptcy proceeding is a "particular dispute or matter arising within a pending case—as opposed to the case as a whole." *Black's Law Dictionary* 1221 (7th ed.1999). This definition is in accord with one of the primary understandings of the term "proceeding" outside of bankruptcy as simply "[a]n act or step that is part of a larger action." *Id.; see, e.g., In re G.T.L. Corp.,* 211 B.R. 241, 244–45 (Bankr.N.D.Ohio 1997) ("A proceeding can be thought of as a step within the bankruptcy case. [The term] encompasses all disputes that rise to the level of a litigated or contested matter." (citation omitted)).[3]

**3.** The advisory committee note to former bankruptcy rule 101 summarized what continues to be the ordinary understanding of the terms "case" and "proceeding" in bankruptcy. The note stated:

■ Finally, an "issue" is a "point in dispute between two or more parties." *Black's Law Dictionary* 835 (7th ed.1999).

■ With this understanding of the relevant terms in mind, we turn to the text of § 1109(b). It is important to recognize, as the Third Circuit did, that the "exact language" of § 1109(b) "grants a right to appear and be heard not in 'a case' but '*on any issue in a case.*'" *Marin*, 689 F.2d at 451 (emphasis added). The "issues" referred to in § 1109(b) occur in proceedings, which themselves occur in and constitute part of the "case." While the bankruptcy rules "distinguish . . . between different types of litigated matters [that arise during the pendency of a bankruptcy case] and divide them into contested matters and adversary proceedings," 10 *Collier on Bankruptcy* at 7000–1 (15th ed. rev.2001), the plain text of § 1109(b) does not distinguish between *issues* that occur in these different types of proceedings within a Chapter 11 case.[4] We hold, therefore, that the phrase "any issue in a case" plainly grants a right to raise, appear and be heard on *any issue* regardless whether it arises in a contested matter or an adversary proceeding. Other courts that have similarly focused on the text of § 1109(b) have reached the same conclusion. *See, e.g., Neuman,* 124 B.R. at 159–60; *Hadar Leasing Int'l Co. v. D.H. Overmyer Telecasting Co. (In re*

A proceeding initiated by a petition for an adjudication under the Bankruptcy Act is designated a "bankruptcy case" for the purpose of these rules. The term embraces all controversies determinable by the court of bankruptcy and all the matters of administration arising during the pendency of the case. . . . The word "proceeding" as used in these rules generally refers to a litigated matter arising within a case during the course of administration of an estate. The term "case" therefore refers to the overall spectrum of legal action taken under one of the debtor relief chapters. It is the widest term functionally. The term "proceeding," by contrast, refers to any particular action raised or commended within the case, including motions and adversary proceedings, whether such actions raise disputed or consensual matters.

2 *Collier on Bankruptcy* ¶ 301.03 (15th ed. rev.2001) (quoting former bankruptcy rule 101 advisory comm. note).

4. With regard to the difference between adversary proceedings and contested matters, *Collier's* explains:

To determine those matters which are required to be brought as adversary proceedings, reference must be made in the first instance to [FRBP] 7001, which contains a categorization of the types of proceedings governed by Part VII [of the FRBP]. An adversary proceeding is further distinguished through the use of formal pleadings-a complaint to institute such a proceeding and an answer to respond to the allegations of the complaint. On the other hand, a contested matter is raised by motion pursuant to Rule 9014.

10 *Collier on Bankruptcy* at 7000–1 (15th ed. rev.2001).

"Most litigated matters in a bankruptcy case are adversary proceedings," *Marin,* 689 F.2d at 450, which have been described as "full blown federal lawsuits within the larger bankruptcy case," *Section 1120(1) Comm. of Unsecured Creditors v. Interfirst Bank Dallas, N.A., (In re Wood & Locker, Inc.),* 868 F.2d 139, 142 (5th Cir.1989); *see also Murphy v. Mich. Guar. Agency (In re Murphy),* 271 F.3d 629, 632 (5th Cir.2001) (adversary proceedings are proceedings "commenced in the bankruptcy court that are adversar[ial] in nature in which one party seeks affirmative relief from another before a bankruptcy court sitting as a trial court over the matters in litigation before it." (citation omitted)). Thus, "based on the premise that to the extent possible practice before the bankruptcy courts and the district court should be the same," the bankruptcy rules governing adversary proceedings "either incorporate or are adaptations of most of the Federal Rules of Civil Procedure." Fed. R. Bankr.P. 7001–1983 advisory comm. note; *see also In re Pub. Serv. Co. of N.H.,* 898 F.2d 1, 2 (1st Cir.1990) (Breyer, J.) (noting the bankruptcy rules "draw strong analogies between an 'adversary proceeding' in bankruptcy and an ordinary 'case' in a district court.").

*D.H. Overmyer Telecasting Co.)*, 53 B.R. 963, 975 (N.D.Ohio 1984) ("The language of § 1109(b) clearly provides an equity security holder with the right to be heard in an adversary proceeding[ ]. Any other construction given to the statute would be contrary to the accepted principles of statutory interpretation." (internal citation omitted)).

2.

Despite this straightforward reading of § 1109(b), the Joint Liquidators contend that the statutory language is ambiguous and that we " 'must look to the statute as a whole and construct an interpretation that comports with its primary purpose and does not lead to anomalous or unreasonable results.' " Appellees' Br. at 14 (quoting *Conn. v. United States Dep't of the Interior*, 228 F.3d 82, 89 (2d Cir.2000)). We reject the Joint Liquidators' effort to construct a narrow interpretation of § 1109(b) based on various materials extrinsic to the text for the following reasons.

a.

The Joint Liquidators argue first that the mere fact that various courts have reached divergent results on the question of § 1109(b)'s applicability to adversary proceedings indicates that the text of the provision must be ambiguous. This argument is unpersuasive because the courts that adopted a narrow view of § 1109(b) based their decisions on grounds other than the text of § 1109(b), relying, for example, on the bankruptcy rules, advisory committee notes, legislative history, or policy concerns. *See, e.g., Fuel Oil*, 762 F.2d at 1286–87; *995 Fifth Ave.*, 157 B.R. at 948–51; *Sarah R. Neuman Found., Inc. v. Garrity (In re Neuman)*, 103 B.R. 491, 495 (Bankr.S.D.N.Y.1989) ("This court views the issue as one which implicates broad issues of bankruptcy policy") *rev'd* 124 B.R. 155 (S.D.N.Y.1991); *Rollert Co. v. Charter Crude Oil Co. (In re Charter Co.)*, 50 B.R. 57, 61 (Bankr.W.D.Tex.1985) ("*Marin* can be distinguished by a subsequent change in the Rules of Bankruptcy Procedure."); *First Wis. Nat'l Bank v. Terex Corp. (In re Terex Corp.)*, 53 B.R. 616, 623 (Bankr.N.D.Ohio 1985) (*Marin* "misreads the legislative history to section 1109, and considers the issue from too narrow a perspective"). As noted above, even the *Fuel Oil* Court conceded that "[b]ased on the Bankruptcy Code alone . . . , the argument that § 1109(b) creates an absolute right to intervene in adversary proceedings appears strong." 762 F.2d at 1286. The fact that a number of courts have elevated other sources above the text does not prove that the text is ambiguous.

b.

The Joint Liquidators further contend that failing to construct an interpretation of "case" in § 1109(b) that excludes adversary proceedings would render § 1109(b) inconsistent with the bankruptcy rules and advisory committee notes. There appear to us to be at least two problems with this line of argument. First, as a general matter, forsaking the plain meaning of a provision of the Bankruptcy Code solely because that meaning conflicts with a bankruptcy rule would run afoul of 28 U.S.C. § 2075. Second, we disagree, in any event, that the bankruptcy rules or the advisory committee notes require the interpretation of "case" advocated by the Joint Liquidators.

The Rules Enabling Act ("REA") provides in relevant part that "[t]he Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11. *Such rules shall not abridge, enlarge, or*

*modify any substantive right."* 28 U.S.C. § 2075 (emphasis added).[5]

The Joint Liquidators argue that courts interpreting § 1109(b) narrowly have simply used the rules as evidence of Congress's intent. Concerning the *Fuel Oil* Court's reliance on the rules, we are urged to follow *995 Fifth Ave.,* which concluded, "[f]ar from using [FRBP] 7024 to modify or enlarge a substantive right, the Fifth Circuit merely looked to 7024 to help it ascertain Congress's intent regarding the scope of § 1109(b)." 157 B.R. at 948.[6] "Because [§ ] 1109(b) does not grant parties in interest the absolute right to intervene in adversary proceedings" the Joint Liquidators assert, "the District Court's decision did not violate 28 U.S.C. § 2075." Appellees' Br. at 29. In other words, according to the Joint Liquidators, only if we assume from the outset that the term "case" includes adversary proceedings would we be in danger of using the rules to modify a substantive right. If we refrain from adopting a view of the scope of § 1109(b) before turning to the rules, this reasoning goes, then we are merely using the rules to assist our understanding of Congressional intent as to the breadth of the intervention right conferred in the Code.

Fortunately, we need not puzzle long over this chicken and the egg dilemma. The REA admonishes us that the Code rather than the rules provides the controlling indication of Congress's intent with regard to substantive rights.[7] In light of the REA's placement of the rules in a subsidiary position to the Code, we believe that the proper interpretive approach is to give the language of § 1109(b) its most natural reading in the context of the Code first. Just as under the REA we must not read the rules to abridge rights granted in the Code, we believe that we must also refuse to use the rules to create ambiguity in an otherwise clear Code provision.

Although we conclude that we need not resort to the rules and advisory committee notes to discern Congress's intent in § 1109(b), we add that we find no tension between our reading of § 1109(b) and the rules and notes relied on by the Joint Liquidators.

Two bankruptcy rules deal with intervention, FRBP 7024 and 2018. FRBP 7024 governs intervention in an adversary proceeding and directs simply that "Rule 24 F.R. Civ. P. applies in adversary proceedings." Fed. R. Bankr.P. 7024. The Joint Liquidators assert that a broad interpretation of § 1109(b) would render FRBP 7024 a "nullity." They suggest that reading § 1109(b) to confer an unconditional right to intervene within the meaning of FRCP 24(a)(1) would make FRCP 24(a)(2) and (b)(1) & (2) superfluous in adversary

5. As an aside, we note that the Joint Liquidators' assertion that Congress intended categorically to distinguish cases from proceedings would appear to lead to the conclusion that the Supreme Court has no power under § 2075 to prescribe rules for adversary proceedings since that section refers only to practice and procedure "in cases." Obviously, however, the Joint Liquidators do not argue for this peculiar result.

6. *But see Official Comm. of Unsecured Creditors of Allegheny Int'l, Inc. v. Mellon Bank, N.A. (In re Allegheny Int'l, Inc.),* 107 B.R. 518, 524–25 (W.D.Pa.1989) (reversing, pursuant in part to § 2075, a bankruptcy court's holding that bankruptcy rules 2018 and 7024 overruled *Marin*'s interpretation of § 1109(b)).

7. Furthermore, the advisory committee note to FRBP 1001 states that "procedural rules promulgated pursuant to 28 U.S.C. § 2075 [must] be consistent with the bankruptcy statute.... Thus, ... any procedural matters contained in title 11 or 28 U.S.C. with respect to cases filed under 11 U.S.C. would control." Fed. R. Bankr.P. 1001 advisory comm. note (1983).

proceedings. This argument is flawed for the simple reason that § 1109(b), by its express terms, pertains only to parties in interest; other entities seeking intervention in an adversary proceeding may well find it necessary to enter those proceedings by way of FRCP 24(a)(2), (b)(1), or (b)(2). *See* Fed.R.Civ.P. 24(a)(2), (b)(1), (b)(2).

FRBP 2018 governs permissive intervention in a case.[8] The Joint Liquidators appear to concede that FRBP 2018 is not inconsistent with a broad interpretation of § 1109(b) because FRBP 2018 applies to entities that are not parties in interest and not entitled to intervene as of right under § 1109(b). Appellees' Br. at 20; *cf. In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr.E.D.Mich.1994) ("Rule 2018(a) provides for intervention by entities not otherwise having a right to participate in the bankruptcy case under § 1109 or other provisions. Consequently, an entity given the right to be heard under § 1109 need not seek leave under Rule 2018(a) to intervene in a case." (citation omitted)).

Although apparently conceding the consistency of FRBP 2018, itself, with our interpretation of § 1109(b), the Joint Liquidators do contend that the advisory committee notes to both FRBP 7024 and 2018

indicate that Congress intended the term "case" in § 1109(b) to exclude "adversary proceedings." The advisory committee note to FRBP 7024 states:

> A person may seek to intervene in the case under the Code or in an adversary proceeding relating to the case under the Code. Intervention in a case under the Code is governed by Rule 2018 and intervention in an adversary proceeding is governed by this rule. Intervention in a case and intervention in an adversary proceeding must be sought separately.

Fed. R. Bankr.P. 7024 advisory comm. note.

The advisory committee note to FRBP 2018 states in relevant part:

> This rule ... implements §§ 1109 and 1164 of the Code. Pursuant to § 1109 of the Code, parties in interest have a right to be heard. ... This rule does not apply in adversary proceedings. For intervention in adversary proceedings, see Rule 7024. ... Subdivision (a) [of this rule] ... permits intervention of an entity ... not otherwise entitled to do so under the Code or this rule. Such a party seeking to intervene must show cause therefor.

Fed. R. Bankr.P.2018 advisory comm. (1983).[9]

---

8. FRBP 2018 states in relevant part:
 (a) Permissive Intervention.
 In a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter.
 Fed. R. Bankr.P.2018. Other sections of the rule provide for intervention by a state attorney general, the Secretary of the Treasury in a Chapter 9 case, and labor unions. *Id.*

9. While the advisory committee note to FRBP 2018 states that it "implements" § 1109, it is clear that § 1109(b) provides for intervention as of right by a party in interest while FRBP 2018 provides for permissive intervention by an entity not otherwise entitled to do so under

the Code (*e.g.*, an entity other than a party in interest under § 1109(b)). As one court has observed, "Rule 2018(a) appears to apply to parties *not* governed by § 1109(b). Therefore, the language in the Advisory Committee note stating that Rule 2018 implements § 1109 is at best ambiguous, and does not seem sufficient basis for determining that § 1109 is exclusively limited to proceedings for which Rule 2018 is applicable." *In re Allegheny*, 107 B.R. at 524; *see also S. Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207 B.R. 57, 62 (S.D.N.Y.1997) ("Permissive intervention [in a case under FRBP 2018] provides the Bankruptcy Courts with a mechanism to allow entities that do not technically qualify as 'parties in interest' to participate in proceedings. ...").

Although the bankruptcy rules and the advisory committee notes envision separate formalities for intervening in cases and adversary proceedings, they do not necessitate that the term "case" in § 1109(b) be construed to exclude adversary proceedings.[10] In *Marin*, the Third Circuit confronted a comparable argument that adversary proceedings could not fall within the scope of the term "case" on the ground that a case is commenced by the filing of a petition and an adversary proceeding commenced separately by the filing of a complaint. The *Marin* Court concluded this distinction proved little: "an adversary proceeding is commenced in a different manner from the case with which it is connected; no one has ever questioned this." 689 F.2d at 450. Likewise, although the manner for obtaining leave to intervene in an adversary proceeding differs under the rules from the manner for obtaining leave to intervene in the case, this difference is irrelevant to the question of whether an entity possesses a right to intervene. Here, as everyone agrees, § 1109(b) grants parties in interest the right to raise and appear and be heard on any issue in a Chapter 11 case; nothing in FRBP 2018 and 7024 is inconsistent with the conclusion that issues raised in an adversary proceeding are issues in the Chapter 11 case within the plain meaning of § 1109(b).

c.

The Joint Liquidators argue that "the statutory scheme" supports the inference that Congress regarded cases and adversary proceedings as distinct concepts for

intervention purposes. Appellees' Br. at 22–23. They point to 11 U.S.C. § 307 and to several provisions in Title II of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (1978) (the "1978 Reform Act" or "Act").

With regard to § 307, the Bankruptcy Code provides that the United States Trustee "may raise and may appear and be heard on any issue in any case or proceeding under [Title 11]." 11 U.S.C. § 307. The Joint Liquidators argue that had Congress intended the phrase "issue in a case" in § 1109(b) to embrace adversary proceedings, it would not have been necessary for Congress to have included the phrase "or proceeding" in § 307. We note, however, that § 307 was added to the Code in 1986, subsequent to the conflicting decisions in *Marin* and *Fuel Oil* on the meaning of § 1109(b). *See* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, § 205, 100 Stat. 3098 (1986). Rather than conclude Congress intended to grant the United States Trustee intervention rights significantly greater than those granted parties in interest by virtually identical statutory language, we find it more likely that Congress simply added the word "proceeding" to § 307 to alleviate doubts that the intervention rights extend to all proceedings in a case.

The remaining provisions identified by the Joint Liquidators as evidencing a statutory scheme in which "case" excludes adversary proceedings appear in the 1978 Reform Act's amendments to Title 28 of the United States Code. As the Joint Liq-

---

**10.** *Cf. Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1141 n. 7 (1st Cir.1992) ("An entity asserting a protectable interest in an adversary proceeding, yet not a 'party in interest' to the larger bankruptcy case, must first seek intervention in the bankruptcy case under Bankruptcy Rule 2018. Whereas

Bankruptcy Rule 7024 governs intervention in an adversary proceeding within the bankruptcy case. [sic] Thus, intervention must be separately permitted in the bankruptcy case and in an adversary proceeding within the bankruptcy case.")

uidators and several courts have pointed out, the distinctions drawn by Congress between cases and proceedings under Title 28 "include separate provisions dealing with jurisdiction, 28 U.S.C. § 1471(a) and (b); abstention, 28 U.S.C. § 1471(d) and 11 U.S.C. § 305; venue, 28 U.S.C. § 1472 and § 1473; and jury trials, 28 U.S.C. § 1480(a)." *Fuel Oil*, 762 F.2d at 1286; *see also 995 Fifth Ave.*, 157 B.R. at 949 (relying on the distinctions in Title 28 as a basis for reading § 1109(b) narrowly); *Megan–Racine Assocs. v. Niagara Mohawk Power Corp. (In re Megan–Racine Assocs.)*, 176 B.R. 687, 692 (Bankr.N.D.N.Y. 1994) (same); *Kenan v. FDIC (In re George Rodman, Inc.)*, 33 B.R. 348, 349 (Bankr.W.D.Okla.1983) (same). We disagree that these distinctions occur within the "statutory scheme" relevant to discerning Congress's intent in § 1109(b).

With the 1978 Reform Act, Congress conducted a massive overhaul of both the bankruptcy law and the judicial system within which it was administered. *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 52–53, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Title I of the 1978 Reform Act enacted Title 11 of the United States Code, creating the new substantive law of bankruptcy, while Title II of the Act consisted of amendments to Title 28 of the United States Code, creating a new bankruptcy court system. 1 *Collier on Bankruptcy* ¶ 1.01[3] (15th ed. rev.2001). The Joint Liquidators focus on distinctions that appeared in Title II, in which Congress established courts possessing jurisdiction to render final decisions in all proceedings that would affect the outcome of a bankruptcy case, includ-

ing proceedings "related to" the case but based on state law.

Under the law prior to the 1978 Reform Act, district courts had jurisdiction over bankruptcy cases and typically referred bankruptcy matters to "referees." *Marathon*, 458 U.S. at 53, 102 S.Ct. 2858. "Under this system, bankruptcy referees played a dual role: deciding disputes and administering bankruptcies." *Phar–Mor, Inc.*, 22 F.3d at 1234. The referees had limited jurisdiction to decide issues that were tangentially related to the bankruptcy case. *Marathon*, 458 U.S. at 53, 102 S.Ct. 2858. One of the primary goals of the 1978 Reform Act, therefore, was "to ensure adjudication of all claims in a single forum and to avoid the delay and expense of jurisdictional disputes." *Id.* at 87, n. 40, 102 S.Ct. 2858. To achieve this, Congress created a system of bankruptcy courts having jurisdiction over "all cases under title 11" as well as "all civil proceedings arising under title 11 or arising in or related to cases under title 11." *See* 1978 Reform Act, Title II, Sec. 241(a) (28 U.S.C. § 1471(a)-(c)), *reprinted in Collier on Bankruptcy* App. at Pt. 4–169 (15th ed. rev.2001).[11] The House Report called the expanded jurisdiction of these courts "a significant change from current law" and stated that the bankruptcy courts would have the "broadest grant of jurisdiction to dispose of proceedings that arise in bankruptcy cases or under the bankruptcy code." H.R.Rep. No. 95–595, 445 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6400. Concerning the term "proceeding" in these provisions, the House Report explained:

> The bill uses the term 'proceeding' instead of the current 'matters and proceedings' found in the Bankruptcy Act

---

**11.** The Supreme Court subsequently found key elements of the new bankruptcy court system unconstitutional. *Marathon*, 458 U.S. 50, 76, 83, 86, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). To solve these constitutional prob-

lems, Congress made further modifications to the system with the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333.

and Rules. The change is intended to conform the terminology of [T]itle 28, under which anything that occurs within a case is a proceeding. Thus, proceeding here is used in its broadest sense, and would encompass what are now called contested matters, adversary proceedings, and plenary actions under the current bankruptcy law. It also includes any disputes related to administrative matters in a bankruptcy case.

*Id.* at 445, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6400–01. The House Report further stated that the provisions granting jurisdiction over proceedings " 'arising under title 11,' 'arising under a case under title 11,' and 'related to a case under title 11,' " were intended to "leave no doubt as to the scope of the bankruptcy court's jurisdiction over disputes." *Id.* at 445–46, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6401.

As the 95th Congress collected different types of proceedings—including those based on state law—into the fold of the bankruptcy court system, it was indeed aware of the distinction between cases and proceedings for purposes of jurisdiction, venue, and abstention. These distinctions, however, do not demonstrate that Congress, in the different context of deciding parties' rights within the substantive bankruptcy law, intended the term "case" to exclude adversary proceedings.

#### d.

Finally, the Joint Liquidators argue that refusing to recognize an unconditional right under § 1109(b) for parties in interest to intervene in adversary proceedings would have "the salutary effect of granting bankruptcy judges a reasonable, objective basis for balancing the interests of litigants in adversary proceedings with those of would-be intervenors." Appellees' Br. at 4.

Certainly, reasonable arguments can be made on both sides of the policy questions connected with an unconditional right to intervene. The *Fuel Oil* Court was concerned that such a right would open the door to "perhaps hundreds" of creditors becoming automatic parties to an adversary proceedings. 762 F.2d at 1287. One bankruptcy court similarly feared extensive intervention "could produce complete chaos in the administration of the estate." *Neuman,* 103 B.R. at 499. Another court expected that "[a]llowing every creditor and other party in interest under § 1109(b) to intervene . . . would impede the court's ability to understand or to manage the proceeding effectively." *995 Fifth Ave.,* 157 B.R. at 951.

The *Marin* Court, on the other hand, considered such policy concerns "unrealistic." 689 F.2d at 453.

Appellants claim that the confusion, disorder, and expense that supposedly would be entailed by allowing each creditor or stockholder to intervene in adversary proceedings are such that it is "clearly unthinkable" that Congress could have intended to allow such a result. But the unqualified right of creditors and stockholders to intervene appears to have been the rule under [the prior bankruptcy law] for approximately 40 years, and the legislative history of section 1109(b) shows no dissatisfaction with it.

*Id.*

After living with the *Marin* decision for over a decade, the Third Circuit continued to find that policy concerns favored an unconditional right to intervene.

Section 1109(b) is an important monitoring tool at the disposal of the creditors' committee. Intervention under that section appears to be appropriate to the extent it will: (1) minimize the need for extensive judicial oversight, (2) speed

the debtor's successful reorganization, and (3) allow the creditors' committee to exert enough leverage on the debtor-in-possession so that the debtor-in-possession does not use its extensive flexibility and discretion in a Chapter 11 reorganization to compromise the creditors' interests. In short, interests of efficiency and fair play underlie § 1109(b), and the driving force behind the *Marin* decision was the belief that allowing intervention into adversary proceedings would best serve those interests.

*Phar–Mor, Inc.,* 22 F.3d at 1240.

We need not choose among the competing policy rationales for and against an unconditional right to intervene, because we "do not sit to assess the relative merits of different approaches to various bankruptcy problems." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 13, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). "It suffices that the natural reading of the text produces the result we announce," *id.,* and "[u]nless it leads to absurd or futile results, we must enforce what Congress has commanded whether or not we agree with its policy choices," *Bell v. Bell (In re Bell),* 225 F.3d 203, 219 (2d Cir.2000) (internal quotation marks and citation omitted).

\* \* \* \* \* \*

The Joint Liquidators' argument that TLHC lacks standing to intervene, raised for the first time on appeal, is without merit.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's order of May 8, 2000 and the bankruptcy court's order of September 30, 1999 and hold that TLHC possesses an unconditional right to intervene under 11 U.S.C. § 1109(b) and Fed. R. Civ. P. 24(a)(1).